# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

DIAMOND D. BLAIR,            )
                              )
               Plaintiff,     )
                              )
            v.               )      No.  6:15-03532-CV-S-RK
                              )
ROGER TERRY, et al.,         )
                              )
               Defendants.    )

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTIONS TO DISMISS AND
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
## PERMANENTLY SEALING EXHIBITS A, B, F, H, K, L, M, 1 & 2

Several motions are before the Court: Defendants' five separate Motions to Dismiss (docs. 93, 94, 95, 96 and 97), Defendants' Motion for Partial Summary Judgment (doc. 123), and the issue of permanently sealing certain exhibits submitted by the parties in connection with the summary judgment motion (docs. 125, 126, 132, 134, 136 and 142). All matters are ripe for disposition. As explained below, the Motions to Dismiss and Motion for Partial Summary Judgment are **GRANTED in part** and **DENIED in part**; and the Court further grants leave to permanently seal nine out of the ten exhibits at issue. Following this ruling, Counts III, IV, and VI remain for trial.

## I.      Procedural Background

Plaintiff Diamond Blair is currently an inmate in the custody of the Missouri Department of Corrections ("MDOC"). Blair, acting *pro se*, initially filed this civil rights action pursuant to 42 U.S.C. § 1983 on December 9, 2015, stemming from two separate attacks on Blair by other inmates. (Doc. 1.) On April 18, 2017, Blair, now with appointed counsel, filed his Second Amended Complaint ("Complaint") (doc. 87), which is the operative complaint.[1] Blair brings

---

[1] Blair initially filed this lawsuit naming as defendants Michael Bowersox, Roger Terry, George Lombardi, Sabrina Bates, Paula Phillips-Reed, and four John Doe Defendants. (Doc. 1.) The Court severed and dismissed the John Doe Defendants without prejudice, explaining that Blair may seek to add them as Defendants if he was later able to identify them. (Doc. 5.) On June 27, 2016, Blair was granted leave to file his First Amended Complaint, which added seven defendants, namely, Phillip Rippinger, Jeremy Roach, Victoria Tausend, Nicolas Olalde, Rodney Holland, Alan Earls, and Richard Martin. (Doc. 39.) On April 18, 2017, Blair's Second Amended Complaint added John Gerke and removed Earls, Bowersox, Lombardi, and Phillips-Reed. (Doc. 87.)

this action against nine MDOC officers in their individual capacities. At all times relevant to this action, Defendants Roger Terry and Sabrina Bates were employed by MDOC at South Central Correctional Center ("SCCC"); Defendants Phillip Rippinger, Jeremy Roach, Victoria Tausend, Nicolas Olalde, and Rodney Holland (collectively "Unit 5 officers") were also employed by MDOC at SCCC; and Defendants Richard Martin and John Gerke were employed by MDOC at Jefferson City Correctional Center ("JCCC").

Blair seeks damages to compensate for injuries he sustained as a result of several alleged constitutional rights violations. Specifically, Blair claims Defendants failed to protect him from attack (Counts I against Unit 5 officers; Count II against Bates; Count III against Terry), denied him due process in connection with his prolonged retention in administrative segregation (Count IV against Terry), and disciplined him in retaliation for filing this lawsuit and using MDOC's grievance procedure (Counts V against Martin; Count VI against Gerke).

In Defendants' motions to dismiss, they argue that all counts should be dismissed pursuant to the exhaustion requirement under the Prison Litigation Reform Act (the "PLRA"), 42 U.S.C. § 1997e(a). In addition to this argument, in Gerke's motion to dismiss (doc. 94), he argues the claim against him should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). In Defendants' summary judgment motion, Defendants incorporate and re-assert the exhaustion arguments raised in the motions to dismiss and also raise arguments related to Blair's failure-to-protect and retaliatory discipline claims in Counts I, II, III, V, and VI.[2] Blair opposed the motions to dismiss and summary judgment motion. (Docs. 103, 104, 105, 106, 107 and 140.) Defendants did not file any reply suggestions. In connection with the summary judgment motion, the parties also seek to permanently seal ten exhibits. On November 17, 2017, upon Blair's request, oral argument was held on the summary judgment motion.

In Part II below, the Court first takes up Gerke's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Next, in Part III, the Court addresses the summary judgment motion regarding the PLRA's exhaustion requirement[3] followed by the remaining arguments related to Counts I, II, III, V, and VI. Finally, in Part IV, the Court resolves the seal issue.

---

[2] Defendants' Motion for Partial Summary Judgment does not involve Count IV.

[3] The PLRA's exhaustion requirement involves documents submitted by Defendants which are outside the pleadings. Therefore, the Court will address the exhaustion requirement pursuant to the summary judgment standard. *See* Fed. R. Civ. P. 12(d).

## II.      Gerke's Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 94)

### A.      Legal Standard

When considering a motion to dismiss, the Court must liberally construe the complaint in favor of the plaintiff, accepting material allegations of fact in the complaint as true, unless those allegations are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible when the facts asserted by the plaintiff "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  The plausibility standard asks only "for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

### B.      Discussion

Gerke contends Blair has not presented facts demonstrating how Gerke engaged in retaliatory discipline in violation of 42 U.S.C. § 1983.  Relevant to this argument, "[a] prima facie case of retaliatory discipline requires a showing that: (1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline."  *Haynes v. Stephenson*, 588 F.3d 1152, 1155 (8th Cir. 2009) (citation omitted); *see also Williams v. Horner*, 403 F. App'x 138, 140 (8th Cir. 2010) (the Eighth Circuit has "consistently found the filing of a disciplinary action against an inmate, if done in retaliation for the inmate's use of the grievance procedure against prison staff, is allegation sufficient to survive dismissal at the pleading stage.") (citations omitted).

As context, Blair's claim against Gerke, added in his Second Amended Complaint filed on April 18, 2017, arises from events occurring after the June attack and Blair's transfer to JCCC on July 28, 2015.  Blair alleges each of the necessary elements: (1) Blair exercised his constitutionally protected rights to file this lawsuit and use the prison grievance procedure (doc. 87 at ¶ 174), *see Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (inmates have a constitutional right to access the courts); (2) subsequent to Blair initiating this lawsuit, Gerke instructed that a conduct violation be issued to Blair for the common practice of placing a newspaper outside his cell to collect clean laundry and placed him in administrative segregation (doc. 87 at ¶¶ 122, 124, 176); and (3) Blair's initiating of this lawsuit and use of MDOC's grievance procedure were the determining factors in Gerke causing Blair to be issued a conduct

violation and placing Blair in administrative segregation in that Gerke would not have done so but for Blair engaging in those protected activities (doc. 87 at ¶¶ 122, 124-25, 179), *see Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008) (citation omitted)) ("An inmate may maintain a cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for an inmate's exercise of constitutional rights.").

Additionally, Blair alleges Gerke made the following statements: Gerke stated they "got" Blair after Blair was issued a conduct violation (doc. 87 at ¶ 109); Gerke told Blair he does "not belong in his PC unit" and he doesn't "want [Blair] over here" while Blair was confined in administrative segregation (doc. 87 at ¶ 116); and Gerke told another inmate to stay away from Blair because Gerke was watching Blair, and if Blair made a wrong move, he would "bury [Blair] in the hole [administrative segregation]" and Blair "could file a lawsuit about that with his lawyers since he likes to sue people" (doc. 87 at ¶ 117).

Based on these facts, when considered under the *Iqbal/Twombly* plausibility standard, Blair has sufficiently stated a retaliatory discipline claim based on Gerke instructing or causing the issuance of a conduct violation to Blair and placing Blair in administrative segregation. Consequently, Gerke has not established he is entitled to dismissal of Blair's claim per Fed. R. Civ. P. 12(b)(6).

## III.     Defendants' Motion for Summary Judgment on Counts I, II, III, V, and VI

### A.     Facts

For the purpose of this Order, the Court finds the following facts are supported by the record.

#### 1.     The April Attack

On April 7, 2015, the day Blair arrived at SCCC, Blair was attacked from behind and stabbed approximately six or seven times with a makeshift metal knife by another inmate, Qusai Mahsin ("April attack").  (SOF 1, 11.)  At the time of the April attack, Blair did not know he would be attacked that day, did not know his attacker or why his attacker stabbed him.  (SOF 9, 10, 68)  The fight occurred indoors, and prison officials quickly intervened and stopped the fight.  (SOF 8, 12.)  Bates, a correctional officer at SCCC, witnessed the April attack.  (SOF 70.)

## 2. The June Attack

After the April attack, while Blair was in administrative segregation on or about April 13, 2015, Blair told Deputy Assistant Warden Terry he had a "hit" on him and needed to be placed in protective custody or to be transferred to another institution. (SOF 76, 77.) Terry responded that Blair would not be transferred or placed in protective custody because of his history as an "aggressive" inmate. (SOF 79.) Terry first met Blair more than twenty years before at another prison. (SOF 80.) According to Blair, Terry's statements amounted to a threat that Blair would stay in administrative segregation indefinitely and therefore Blair's only options were to remain in administrative segregation indefinitely or return to general population. (SOF 15, 17, 77, 81, 85.) As a result, Blair signed three protective waivers—on April 15, May 13, and June 5—and Terry released him into general population on June 5, 2015. (SOF 15, 17, 77, 81, 85.)

On June 7, 2015, two days after Blair was released into general population and assigned to Unit 6, Blair was attacked again by other inmates at SCCC ("June attack"). (SOF 17-18, 88; Ex. C, Blair Dep. 27:16-29:6.) The June attack occurred outside, in a walkway of the prison's main yard. (SOF 19.) Blair was attacked from behind and stabbed approximately eight times. (SOF 22.) Blair did not see his attackers nor did he know he would be attacked that day. (SOF 20-22.) Prison officials did not respond in time to intervene. (SOF 23.)

At or around the time Blair was attacked, Bates was standing approximately twenty feet away outside the dining room door. (SOF 116.) Another inmate, Scottie Willett, was working in food service and was leaving the dining hall around the time of the attack. (SOF 117.) Willett passed Bates and approached Blair. (SOF 119-121.) According to Willett, Bates was smoking a cigarette. (SOF 119.) Willett then got Bates' attention and called her over to Blair. (SOF 121.) Willett testified that if he were standing where Bates was standing, he would have been able to see Blair. (SOF 122.) Bates walked over to Blair, asked if Blair was okay, and called in a medical emergency. (SOF 23-24, 123.) Blair reports he was lying on the ground for several minutes before Bates responded to his calls for help. (SOF 123-24.) Blair received urgent medical care and treatment following the attack. (SOF 25.) As a result of the June attack, Blair sustained injuries including puncture wounds to his neck and back, a cervical spinal fracture, a penetrating spinal cord injury, temporary paralysis in his right arm and leg, and severe nerve damage that may be permanent. (SOF 25, 133.)

The June attack was carried out by inmates assigned to Unit 5—Terrell Dawson, Vonerrick Williams, and Monty Ross ("Unit 5 offenders"). (SOF 89, 107-15.) The Unit 5 offenders entered the main yard where Blair and other Unit 6 inmates had been released for their recreational period. (SOF 86, 90.) Security footage from the time of the attack shows the Unit 5 offenders freely leaving Unit 5, proceeding down to the walkway, stabbing Blair, then immediately returning to Unit 5. (SOF 106-13.) Per MDOC procedures, inmates assigned to different housing units are not permitted to recreate on the prison's yard for safety and security reasons. (SOF 92.)

The June attack occurred during a ten-minute window that began at 1:20 p.m. when inmates could be released from their housing units to "call outs" to attend medical appointments, jobs, religious services, and other programs. (SOF 102.) The only reason to release anyone from Unit 5 would be if they had a "call out." (SOF 95, 102, 104-05, 114-15.) Housing unit officers receive a list of inmates who have call-outs during that ten-minute window. (SOF 103.) However, records of "call outs" are destroyed and not kept. (SOF 114-15.)

Correctional officer Rippinger was assigned as the Unit 5 sergeant who was responsible for overseeing inmate "call outs" and movement. (SOF 96.) Correctional officer Tausend was responsible for opening the cell doors in Unit 5. (SOF 98.) Correctional officers Holland and Roach were also assigned to Unit 5. (SOF 97.) Holland, Roach and Tausend claim not to know why the Unit 5 offenders were released from their housing unit when Blair was attacked. (SOF 114.) Holland observed that Unit 5 had been quiet for two days prior to the June attack, and he noticed some of the offenders who were typically loud and active in the yard were quiet. (SOF 126.)

Correctional officer Olalde was standing in the yard in front of the Unit 5 doors monitoring inmates around the time of the June attack. (SOF 106.) Leading up to the attack on that day, Olalde observed "abnormal behavior on the yard" and he had a "gut feeling . . . something wasn't right." (SOF 127.) Olalde twice reported his "gut feeling" of suspicious activity. (SOF 128.) Olalde first reported his suspicion to the Captain's office in the morning and reported it again after Unit 5 returned from its noon meal. (SOF 129.) He then called to give the Captain's office a "heads up that something could happen on the yard that day." (SOF 130.) When the attack on Blair occurred that day, Olalde was not surprised. (SOF 131.)

In the MDOC investigation into the June attack, Blair reported there was a threat group known as "Fam" that had a hit on Blair because of incidents that had occurred years prior concerning Blair's brother.  (SOF 69.)

### 3.  JCCC

Following the June attack, Blair was transferred to JCCC on July 28, 2015, and placed in temporary administrative segregation.  (Doc. 87 at ¶ 76; Blair Dep. 76:3-9.)  In September 2015, Blair was assigned to protective custody in Unit 6 at JCCC.  (Doc. 87 at ¶ 89; Ex. 20, Gerke Dep. 14:3-16; Blair Dep. 81:3-7,92:3-6.)  On October 21, 2016, Blair placed a sheet of newspaper on the floor outside of his cell to collect his clean laundry, which is a common practice among inmates.  (SOF 195-96.)  Officer Jimmy Anderson told Blair he had a violation coming for littering.  (SOF 197.)  Then, Officer Anderson issued Blair a conduct violation for Rule 18.3—interfering with count.  (SOF 198.)  The October 21 conduct violation states:

> while [Officer Anderson] was performing count in A-wing [] Blair had newspapers laying in front of his cell and when [Officer Anderson] went to remove it he kept claiming its[sic] for laundy[sic] and allowed to have it was going to file on me.  Which places himself in violation of 18.3 interfering with count."

(SOF 30.)

Consequently, Blair was sanctioned with disciplinary segregation and then administrative segregation beginning on October 27, 2016.  (Doc. 87 at ¶ 112; SOF 199.)  Gerke recommended the Administrative Segregation Committee place Blair in administrative segregation.  (SOF 200.)  Gerke is the functional unit manager for protective custody in Unit 6 at JCCC and is in charge of Unit 6's daily operations.  (SOF 192-93; Gerke's Dep. 14:3-16.)  Gerke's responsibilities as functional unit manager include supervising unit staff.  (SOF 194.)  While Blair was in administrative segregation, Gerke told Blair he does "not belong in [Gerke's] PC unit" and he doesn't "want [Blair] over here."  (SOF 201.)  Another office, the functional unit manager for administrative segregation, also told Blair that Gerke did not want Blair in protective custody.  (SOF 202.)

As a result of the October 21 conduct violation, Blair was confined to administrative segregation from October 27, 2016, until January 5, 2017.  (SOF 203.)  When Blair was returning to the protective custody unit, Gerke told another inmate "if Blair makes one wrong move, he will bury him in [administrative segregation], and Blair can file a lawsuit about that with his lawyers since he likes to sue people."  (SOF 204.)  Blair admits he has never received a

conduct violation directly from Gerke.  (SOF 29.)  According to Blair, "everything that goes on in [Unit 6] for something like that comes from Gerke."  (SOF 29.)

### 4.    MDOC's Offender Grievance Procedure

MDOC's grievance procedure details a three-step process.  (SOF 251.)  First, the inmate files an Informal Resolution Request ("IRR") within fifteen days of the alleged incident giving rise to the grievance.  (SOF 252, 255)  At the time an inmate requests an IRR from the staff member responsible for processing IRRs, the inmate should state the subject of the complaint.  (SOF 256; Ex. P at 10.)  The staff member receiving the IRR shall review the complaint to ensure it is within procedural guidelines.  (SOF 258; Ex. P at 13.)

Next, if dissatisfied with the IRR response, the inmate files an Offender Grievance within seven days of receiving that response.  (SOF 253; Ex. P at 15.)  Once a grievance response is prepared, "[t]he offender will review the response in the presence of the grievance office staff member or designee and indicate his response by marking either accept or appeal on the offender grievance form[,] and "[t]he offender will sign and date the form."  (SOF 161-62, 259; Ex. P at 16.)

Then, if dissatisfied with the Offender Grievance response, the inmate submits a Grievance Appeal form to the grievance officer within seven days.  (SOF 254; Ex. P at 17.)  Failure to timely submit a grievance appeal "will result in the appeal being considered abandoned."  After receiving the grievance appeal response, the inmate "has exhausted the grievance process."

### 5.    Grievance SCCC-15-1266

Blair filed an IRR on June 22, 2015, regarding the June 7 attack, which was assigned complaint number SCCC-15-1266.  (SOF 134-35.)  In the IRR, Blair identifies his issue as "negligent security by [prison] staff."  (SOF 137; Doc. 93-6 at 2.)  Blair made the following statements in his IRR.  He was stabbed by inmates assigned to Unit 5, inmates who were "out of bounds," and who had been under observation by staff.  (SOF 136.)  "The inmates involved in assaulting [him] were able to move freely about the institution only with the aid of security staff assigned to Unit 5 on the date in question."  (SOF 137.)  "The assault was a second attempt on [his] life in connection with the assault against [him] 4-7-2015."  (SOF 138.)  Blair sought the following remedies: "transfer[] to SECC; appropriate security measures enforced; each involved

party held accountable; PC needs met by placement in 2D and not segregation as punishment for being stabbed." (SOF 139.)

It was later noted on the IRR that Blair was transferred to JCCC on July 28, 2015. (SOF 140.) MDOC Offender Grievance procedure provides that "[o]ffenders who transfer from one institution to another and have a complaint about the institution from which they transferred, may bypass the informal resolution request process and proceed by filing a grievance within 15 calendar days of the transfer date." (SOF 141.) Blair filed an offender grievance relating to SCCC-15-1266, which is dated August 3, 2015, and marked "received" on August 7, 2015. (SOF 142-43.)

Blair made the following statements in his offender grievance regarding the June 7 attack, and events leading up to it. "[A]fter [he] was assaulted the first time and placed in administrative segregation" Terry visited him at his cell and told him he didn't know what to do with him, and that he would "probably leave [him] here in this cell until I decide what to do." (SOF 144; Ex. W at 4.) Blair took Terry's statement to mean that Terry would assign him to "long-term indefinite segregation." (SOF 145; Ex. W at 4.) Terry "had a responsibility to take reasonable measure to ensure prevention[sic], at least try, of me being physically assaulted a second time[.]" (SOF 146.) In reference to the June attack by the Unit 5 offenders, Blair stated he had been informed by an officer that these inmates were acting "suspicious" and looked "like they were up to something[.]" (SOF 147.) Blair also stated that it was "the obligation of prison officials to keep [him] safe from further harm of prisoner violence" and that "the negligence of the prison officials not to do so was deliberate indifference of [his] safety." (SOF 147.) Blair also specifically mentioned Bates, stating "[i]n the close vicinity was [] Bates; whom stated she had no idea I was being assaulted, (though she was less than 10 feet away, releasing inmates from the dining room's front door) nor that I was on the ground until she heard someone grunting[.]" (SOF 148; Ex. W at 5.)

Blair filed another offender grievance, dated August 14, 2015, which was marked "duplicate filing" by MDOC. (SOF 150.) In the August 14 grievance, Blair stated "the group of inmates involved in assaulting [him] were being 'observed' moving suspiciously[;]" "[t]he same group of inmates were released by 'control-bubble' officers of housing Unit 5[;]" and "Wardens and officers were aware—especially after the first assault—of the potential further risk to my life and had a legal obligation to prevent the attempted murder from occurring." (SOF 152-53;

Ex. W at 8.)  In addition, Blair states Bates was "present and/or in close proximity" to both attacks.  (SOF 155; Ex. W at 9.)  Blair asked for the names of the officers assigned to Unit 5 on the date and time of the June attack, and "that [his] previous grievance under this same number . . . be attached/filed in corroboration with the grievance as they pertain to the same complaint of injury."  (SOF 154, 156.)  Blair never received a response to the August 14 grievance.  (SOF 157.)

On August 31, 2015, the SCCC grievance office denied Blair's August 6 grievance.  (SOF 158.)  The grievance response stated that Blair had "the right to appeal this decision[,]" and that Blair "must file an appeal form with the grievance officer within seven (7) days from the day [he] receive[d] this decision."  (SOF 159; Ex. W at 4.)  Nine days later, on September 9, 2015, Blair signed the grievance response and checked the box on the form indicating he would "appeal this decision."  (SOF 160.)  The grievance form does not state when the grievance denial was provided to Blair.

Blair submitted a grievance appeal regarding SCCC-15-1266, which is dated September 9, 2015, and marked "received" by MDOC on September 18.  (SOF 163.)  In his grievance appeal, Blair stated he had a "right to be protected and to live safely in the general population as opposed to being confined to supermax security housing as a victim of an assault[,]" and he "repeatedly asked to also be transferred to another facility, as an alternative, after [he] was assaulted the first time[.]"  (SOF 164-65.)  Blair's grievance appeal was denied on September 29, 2015.  (SOF 166.)  The certification by the SCCC Institutional Grievance Officer signed on January 19, 2016, attached to SCCC-15-1266, states Blair had "exhaust[ed] these complaints pursuant to federal law[.]"  (SOF 167.)

### 6.    Grievance JCCC-16-2249

On December 2, 2016, JCCC staff received Blair's IRR which was assigned complaint number JCCC-16-2249, complaining of the "discriminatory practice deliberately denying [him] reasonable safety and assignment to protective custody."  (SOF 231-32.)  Blair made the following statements in the IRR.  According to Blair, Gerke had retained him in administrative segregation for a period of six months.  (SOF 233; Ex. U at 2.)  Gerke had referred to Blair as a "rattlesnake," a "wolf in sheep's clothing," and told Blair he does not "belong in PC." (SOF 234.)  On October 21, 2016, Blair was issued a Rule 18.3 conduct violation for having a piece of newspaper on the ground outside his cell to collect his laundry.  (SOF 235.)  After Blair

received the conduct violation, he heard Gerke say "I was looking for a reason to get him out of here . . ." (SOF 236.) "Gerke and the staff/officials . . . have continuously placed high barriers preventing me from seeking PC, and targeting me when I do no[t] desist my PC request." (SOF 237.) His IRR notes that Blair had repeatedly asked for this IRR form starting on October 28, 2016, and only received it the evening of November 22, 2016. (SOF 238; Ex. U at 4.) Blair also stated that his "continuous assignment to the segregation unit is punishment and abuse by administrative officials based on, and to discourage, my assertion of my protective custody needs and surrounding the civil complaints I've filed against [] officials." (SOF 239; Ex. U at 5.)

On December 6, 2016, the JCCC staff denied Blair's IRR. (SOF 240.) On December 16, 2016, Blair filed an offender grievance reasserting the issues raised in the IRR. (SOF 242.) On January 6, 2017, the Warden responded, and stated Blair's complaint was moot because he was placed in protective custody on January 5, 2017. (SOF 243.) On January 11, 2017, Blair checked the box on the form that he would "appeal this decision." (SOF 244.) Blair then filed a grievance appeal which was dated January 11, 2017, and marked "received" by MDOC on January 23, 2017. (SOF 245; Ex. U at 9.) In his grievance appeal, Blair stated "due to [] Gerke's targeting of me as a means to remove me from the protective custody unit, the CDV [conduct violation] #18.3 was arbitrarily issued . . . and retaliatory. The body of the [conduct violation] states I stated I 'was going to file (a complaint) on it (against staff).'" (SOF 245.) Blair further stated "Gerke continues to target me" and that Gerke told another inmate he was going to "bury" Blair in administrative segregation and "let him file a lawsuit with his lawyers about that . . ." (SOF 247; Ex. U at 9.)

On March 16, 2017, the Deputy Division Director denied Blair's grievance appeal and stated "the grievance response adequately address [Blair's] complaint regarding [his] assignment to the Protective Custody Unit." (SOF 248.) The certification by the JCCC Institutional Grievance Officer signed on May 2, 2017, attached to JCCC-16-2249, states Blair had "exhaust[ed] this complaint pursuant to federal law[.]" (SOF 249.)

### 7. Grievance JCCC-16-433

Blair filed an IRR received by MDOC staff on March 1, 2016, concerning "retaliatory conduct violations," which was assigned complaint number JCCC-16-433. (SOF 179.) In the IRR, Blair complained JCCC officer Martin issued him conduct violations and placed him in disciplinary segregation as pretext to hide Martin's retaliation against Blair for having filed a

civil lawsuit against prison officials. (SOF 180; Ex. Z at 2-3.) Blair sought to have two conduct violations dismissed and expunged and to be returned to protective custody or transferred. (SOF 181; Ex. Z at 2.)

On April 4, 2016, JCCC staff denied Blair's IRR, stating under the heading "Nature of Complaint:" "You state you received two retaliatory conduct violations due to a law suit you have against prison officials. It is your request that these two violations . . . be dismissed." (SOF 182, 184.) The response further stated Blair's due process rights had been followed and the disciplinary hearings and all sanctions complied with departmental guidelines. (SOF 185.)

On April 8, 2016, Blair filed an offender grievance relating to the allegations in the IRR. (SOF 186.) On April 25, 2016, the Warden of JCCC responded to Blair's grievance stating Blair should have filed a separate IRR for each of his conduct violations and therefore, he would only address the issue concerning the Rule 12.1 conduct violation issued by Martin. (SOF 187-88; Ex. Z at 7.) The Warden concluded the conduct violation should be dismissed and expunged from Blair's institutional record, and did not take up any other issues related to Blair's grievance. (SOF 189-90.) On May 10, 2016, Blair signed the grievance response and checked the box on the form indicting he "accept[ed] this decision." (SOF 191.)

## B. Legal Standard

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. R. Civ. P. 56(c). "When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### 1. PLRA's Exhaustion of Remedies Requirement

The PLRA requires a prisoner to exhaust all available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement requires proper exhaustion of administrative remedies, *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006), and "it is the prison's requirements, and not the [PLRA], that define

the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). An inmate satisfies § 1997e(a) by pursuing "the prison grievance process to its final stage" to "an adverse decision on the merits." *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014). If the prisoner's claim was not exhausted before filing suit, the district court has no choice but to dismiss it. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Johnson v. Jones*, 340 F.3d 624, 627-628 (8th Cir. 2013) ("If exhaustion was not completed at the time of filing, dismissal is mandatory."). Failure to exhaust under the PLRA is an affirmative defense, which a defendant must plead and prove. *Jones*, 549 U.S. at 211-12.

"[T]he benefits of exhaustion [] include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. "These benefits are fully realized when an inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits, even if the decision-maker could have declined to reach the merits because of one or more procedural deficiencies." *Hammett v. Cofield*, 681 F.3d 945, 948 (8th Cir. 2012). The exhaustion requirement takes into account "the likelihood that prison officials will benefit if given discretion to decide, for reasons such as fairness, or inmate morale, or the need to resolve a recurring issue, that ruling on the merits is better for the institution and an inmate who has attempted to exhaust available prison remedies." *Id.* at 948.

### C. Discussion

#### 1. Exhaustion of Remedies

The Court takes up the summary judgment motion based on the PLRA's exhaustion of remedies requirement as to Counts I, II, III, IV, V, and VI in the order the motions to dismiss, which first raised the arguments, were filed.

##### a. Exhaustion of Remedies as to Count II (Bates)

For his claim against Bates, in Count II of his Complaint, Blair asserts Bates failed to protect him from the second attack by failing to (1) respond when Housing Unit 5 inmates were released into the main yard, (2) assist him while he was being attacked, or (3) respond timely following the attack. (*Id*. at ¶ 140.)

The issue here is whether Blair has properly exhausted his administrative remedies in connection with his claim against Bates through grievance SCCC-15-1266.[4]  Bates argues that SCCC-15-1266 does not show exhaustion of the claim against her because (1) Blair's complaint against Bates is only referenced in his Offender Grievance, and not specifically described in his IRR or Grievance Appeal, and (2) Blair's Offender Grievance and Grievance Appeal violate MDOC's grievance procedure.

Only Blair's Offender Grievance related to grievance SCCC-15-1266 expressly raises a complaint against Bates.  Blair identified his issue in the IRR as "negligent security by [prison] staff" and then described events leading up to the June attack.  Blair does not name Bates or specifically reference his complaint against Bates in the IRR.  At the Offender Grievance stage, however, in his form dated August 3, 2015, Blair describes events surrounding the June attack in more detail than his IRR.  Specific to Bates, Blair states "[i]n the close vicinity was [] Bates; whom stated she had no idea I was being assaulted, (though she was less than 10 feet away, releasing inmates from the dining room's front door) nor that I was on the ground until she heard someone grunting[.]"  In his Offender Grievance form dated August 14, 2015, which was marked "duplicate filing" by MDOC administration, Blair states Bates was "present and/or in close proximity" to both attacks.  Although Blair submitted a Grievance Appeal, in that form, Blair again does not name Bates or specifically reference his complaint against Bates.

Relevant to Bates' first argument, MDOC's grievance procedure did not contain a provision specifying who must be named in a grievance, but requires only that "[t]he offender . . . state the subject of the complaint[,]" (doc. 93-7 at 10, ¶ K.1.b.).  *See Taylor v. Null*, 2015 U.S. Dist. LEXIS 26909, *3 (E.D. Mo. Mar. 5, 2015) (citing *Jones*, 549 U.S. at 219) ("[E]xhaustion is not *per se* inadequate simply because an *individual* later sued was not named in the grievances." (emphasis in original)).[5]  Importantly, in response to each stage of the grievance procedure for SCCC-15-1266—the IRR, Offender Grievance, and Offender Appeal—MDOC

_____

[4] Plaintiff acknowledges that SCCC-15-1266 is the only grievance relevant to his claims in Counts I, II, and III; therefore, the Court does not address other grievances filed by Blair in connection with those Counts.  Also relevant here, the Court also notes that while not dispositive, the certification cover page of the SCCC-15-1266 grievance packet states "[t]he subject did exhaust the complaints pursuant to federal law[.]"  (Doc. 93-6 at 1.)

[5] *But see Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014) (plaintiff failed to exhaust where he failed to identify an official in the grievance procedure who was later named a defendant in the lawsuit and Arkansas prison grievance policy specifically required offenders to name individuals involved).

administration provided a written response that considered the substance of, and denied, Blair's grievance. MDOC never rejected Blair's grievance on the basis of a procedural deficiency. Therefore, Bates' first argument is unpersuasive because SCCC-15-1266 gave MDOC a fair opportunity to address the issue that later formed the basis for Blair's claim against Bates by specifically referencing the claim in his Offender Grievance form.

Following this reasoning, Bates' second argument also fails. For her second argument, Bates contends that SCCC-15-1266 does not show exhaustion of Blair's administrative remedies against her because of the following violations of MDOC's grievance procedure: Blair (1) filed duplicate Offender Grievances, (2) failed to limit his grievance to one issue, (3) added new issues and new persons at the Offender Grievance stage not alleged in the IRR, and (4) abandoned his grievance at the Grievance Appeal stage by failing to submit the form within seven days. However, Blair's grievance was denied, at every administrative level of review, on the merits and not for its failure to comply with MDOC's grievance procedure. Relevant here, ". . . all circuits that have addressed it have concluded that the PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits." *Hammett*, 681 F.3d at 947. Because Blair's Offender Grievance expressly concerns his claim against Bates and MDOC did not deny SCCC-15-1266 as procedurally deficient at any stage but instead addressed it on the merits, Blair exhausted his claim against Bates through SCCC-15-1266. Consequently, Bates has not established she is entitled to summary judgment as to Blair's claim pursuant to the PLRA's exhaustion requirement.

### b.      Exhaustion of Remedies as to Count IV (Gerke)

For his claim against Gerke (Count VI), Blair asserts that Gerke took adverse actions against him in retaliation for filing this lawsuit and using the prisoner grievance procedure by instructing a conduct violation be issued to Blair and placing Blair in administrative segregation. Gerke argues Blair failed to exhaust his claim against Gerke pursuant to the PLRA.

The issue here is whether Blair has properly exhausted his administrative remedies in connection with his claim against Gerke through grievance JCCC-16-2249.[6] Gerke argues that

---

[6] Plaintiff acknowledges that JCCC-16-2195 and JCCC-16-2249 are the only grievances relevant to his claim against Gerke. Because the Court ultimately finds that Plaintiff properly exhausted his administrative remedies for his claim against Gerke through JCCC-16-2249, the Court does not address JCCC-16-2195. Also relevant here, the Court notes that while not dispositive, the certification cover page

JCCC-16-2249 does not show exhaustion of the claim against him because: (1) the grievance does not concern Blair's federal claim against Gerke; and (2) the grievance violates MDOC's grievance procedure.

In the IRR for grievance JCCC-16-2249, Blair identifies his issue as "[d]iscriminatory practice deliberately denying me reasonably safety and assignment to protective custody unit." Blair then supports this assertion by detailing events and communications regarding the denial of his requests for protective custody and his placement in administrative segregation. The focus of Blair's IRR appears to be that he believes he was targeted and discriminated against because he requested protective custody. In support of Blair's assertion that Gerke targeted him, Blair states Gerke told him he does not want Blair "in his PC unit" and that Blair does not belong in protective custody. Blair also states that after he was issued a conduct violation and placed in disciplinary segregation, Blair heard Gerke say "I was looking for a reason to get [Blair] out of here." Blair also states: "my continued assignment to the segregation unit is punishment and abuse by administrative officials based on, and to discourage, my assertion of my protective custody needs and surrounding the civil complaints I've filed against other officials."[7] In Blair's Offender Grievance, he does not expressly name Gerke. However, MDOC's response to the Offender Grievance addresses Blair's claim that Gerke is targeting and discriminating against Blair. Finally, in his Grievance Appeal, Blair complains that Gerke continues to target him.

Relevant to Gerke's first argument, proper exhaustion is defined by the prison grievance process, including "[t]he level of detail necessary in a grievance to comply with the grievance procedures." *Jones*, 549 U.S. at 218. MDOC's grievance procedure requires only that "[t]he offender . . . state the subject of the complaint." (Doc. 94-5 at 10, ¶ K.1.b.) Gerke has not pointed to any requirement that Blair's grievance must exactly match his later federal claim. Therefore, Gerke's first argument is unpersuasive because JCCC-16-2249 gave MDOC a fair opportunity to address the issue that later formed the basis for Blair's claim against Gerke by the allegations in both the IRR and Grievance Appeal. This is also supported by MDOC's response to Blair's Offender Grievance, which addresses Blair's claim against Gerke.

---

of the JCCC-16-2249 grievance packet states "[t]he subject did exhaust the complaints pursuant to federal law."

[7] At the time Blair filed his IRR for grievance JCCC-16-2249, this lawsuit had been pending for just under a year, and Blair's First Amended Complaint was filed adding seven additional MDOC employee defendants five months before.

Gerke further argues that JCCC-16-2249 does not show exhaustion because of the following violations of MDOC's grievance procedure: Blair (1) failed to limit to one issue his IRR, Offender Grievance, and Offender Appeal; and (2) failed to timely file his IRR within fifteen days of the alleged incident. However, Blair's grievance JCCC-16-2249 was denied, at every administrative level of review, on the merits and not for its failure to comply with MDOC's grievance procedure. Relevant here, ". . . all circuits that have addressed it have concluded that the PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012). Because Blair's grievance concerns his claim against Gerke and MDOC did not deny JCCC-16-2249 as procedurally deficient at any stage but instead addressed it on the merits, Blair exhausted his claim against Gerke through JCCC-16-2249. Consequently, Gerke has not established he is entitled to summary judgment as to Blair's claim pursuant to the PLRA's exhaustion requirement.

### c. Exhaustion of Remedies as to Count V (Martin)

For his claim against Martin (Count V), Blair asserts Martin took adverse actions against him by issuing him two conduct violations and sending him to administrative segregation in retaliation for filing this lawsuit and using the prisoner grievance procedure. (Doc. 87 at ¶¶ 93-4, 99, 165.)

The issue here is whether Blair has properly exhausted his administrative remedies in connection with his claim against Martin through grievance JCCC-16-433.[8] Martin argues that JCCC-16-433 does not show exhaustion of the claim against him because: (1) Blair's IRR was untimely filed in violation of MDOC's grievance procedure; and (2) Blair accepted the Warden's Response to his Offender Grievance and did not file a Grievance Appeal.

In the IRR for JCCC-16-433, Blair complains Martin issued him conduct violations in retaliation for his filing of a civil lawsuit against prison officials. MDOC administration denied Blair's IRR on the merits, and Blair filed an Offender Grievance. In the Warden's Response to the Offender Grievance, the Warden indicates Blair should have filed a separate IRR for each of his conduct violations. The Warden's Response then addresses only one issue of Blair's IRR—

---

[8] Plaintiff acknowledges that JCCC-16-433 is the only grievance relevant to his claim against Martin.

the Rule 12.1 conduct violation issued by Martin—and determined to dismiss and expunge that conduct violation.  Blair accepted the decision and did not file a Grievance Appeal.

Turning to Martin's arguments, Martin's first argument fails because MDOC administration addressed the IRR and Offender Grievance on the merits, and did not deny the grievance at either stage as procedurally deficient.  *See Hammett*, 681 F.3d at 947.  Relevant to Martin's second argument, exhaustion of the administrative review process occurs after the inmate files a Grievance Appeal and receives a response.  *See id.*  The Supreme Court has explained the PLRA's exhaustion requirement serves to afford prison officials an opportunity to address complaints internally, and "[i]n some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation."  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) (citation omitted).  Blair's grievance undisputedly relates to his claim against Martin, and Blair did not file a Grievance Appeal, but instead, accepted the Warden's Response to the Offender Grievance.

Therefore, the Court finds that there are no genuine issues of material fact concerning whether Blair properly exhausted his administrative remedies for his retaliatory discipline claim against Martin as required by the PLRA.  Because Blair has not properly exhausted his remedies, Martin is entitled to summary judgment.[9]  *See* Fed. R. Civ. P. 56(c).  Consequently, the Court must dismiss the claim, without prejudice.[10]

---

[9] Blair does not raise any compelling arguments to support his contention that the appeal stage of the prison grievance procedure was not available to him.  Plaintiff asserts that because MDOC administration did not fully address his grievance, he was unable to further pursue the issue of the other conduct violation.  To the contrary, if Plaintiff was dissatisfied with the Warden's Response, Plaintiff could have filed a Grievance Appeal.  Plaintiff also argues that by the time MDOC notified Plaintiff that he should have filed multiple grievances, it would have been too late for him to file a grievance regarding the other conduct violation pursuant to MDOC's grievance procedure.  But to properly exhaust his administrative remedies, Plaintiff needed only to attempt to further pursue the issue, which would have given MDOC administration an opportunity to utilize its discretion to address an otherwise procedurally deficient grievance.  Instead, by not filing a Grievance Appeal, even despite MDOC's denial of part of Plaintiff's grievance due to a procedurally deficiency, Plaintiff failed to properly exhaust the retaliatory discipline issue he raises in this lawsuit against Martin.  *See Jones v. Bock*, 549 U.S. 199, 204 (2007) ("Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").

[10] Because the claim against Martin in Count V is dismissed for failure to exhaust administrative remedies, the Court does not address the remaining arguments pertaining to Count V in the motion for summary judgment.

**d.      Exhaustion of Remedies as to Count I (Unit 5 officers)**

For his claim against Unit 5 Officers in Count I of his Complaint, Blair asserts that Unit 5 officers failed to protect him from the June attack by permitting the comingling of Unit 5 and Unit 6.

The issue here is whether Blair has properly exhausted his administrative remedies in connection with his claim against Unit 5 officers through grievance SCCC-15-1266. Unit 5 officers argue that SCCC-15-1266 does not show exhaustion of the claim against them because of the following violations of MDOC's grievance procedure: Blair (1) filed duplicate Offender Grievances, (2) failed to limit his grievance to one issue, (3) added new issues and new persons at the Offender Grievance stage not alleged in the IRR, and (4) abandoned his grievance at the Grievance Appeal stage by failing to submit the form within seven days.  However, as discussed above in Part II.1.a, Blair's grievance SCCC-15-1266 was denied, at every administrative level of review, on the merits and not for its failure to comply with MDOC's grievance procedure. *See Hammett*, 681 F.3d at 947 (PLRA's exhaustion requirement is satisfied if prison official decide a procedurally flawed grievance on the merits).  Unit 5 officers do not dispute Blair's Offender Grievance concerns his claim against Unit 5 Officers.  Therefore, because MDOC did not deny SCCC-15-1266 as procedurally deficient at any stage but instead addressed it on the merits, Blair exhausted his claim against Unit 5 officers through SCCC-15-1266.  Consequently, Unit 5 officers have not established they are entitled to summary judgment as to Blair's claim per the PLRA's exhaustion requirement.

**e.      Exhaustion of Remedies as to Counts III and IV (Terry)**

In Count III of his Complaint, Blair asserts Terry failed to protect him from the June attack by refusing to place him in protective custody or transfer him, and by presenting him with no other option but to be placed back in general population.  (Doc. 87 at ¶ 148.)  In Count IV of his Complaint, Blair additionally asserts Terry denied Blair due process by his prolonged retention in administrative segregation indefinitely unless he signed a protective custody wavier. (Doc. 87 at ¶¶ 155-158.)

The issue here is whether Blair has properly exhausted his administrative remedies in connection with his claims in Counts III and IV against Terry through grievance SCCC-15-1266. Terry argues that SCCC-15-1266 does not show exhaustion of the claim against him because: (1) Blair only names Terry in his Offender Grievance, and not in his IRR or Grievance Appeal;

(2) Blair's Offender Grievance and Grievance Appeal violate MDOC's grievance procedure; and (3) because Blair does not complain that Terry violated his due process rights by confining him to administrative segregation without meaningful review.

In the IRR for grievance SCCC-15-1266, Blair identifies his issue as "negligent security by [prison] staff." (Doc. 97-4 at 2.) Blair then describes events leading up to the June attack, but does not name Terry or specifically reference his complaint against Terry. Blair sought, among other things, the following remedies: "transferred to [another facility]," "each involved party held accountable," and "[protective custody] needs met by placement in 2D and not segregation as punishment for being stabbed."

At the Offender Grievance stage, in his form dated August 3, 2015, Blair describes events surrounding the June attack in more detail than his IRR. Specific to Terry, Blair states "[a]fter I was assaulted the first time and placed in administrative segregation . . . [Terry] . . . said to me: '. . . I don't know what to do with you . . . probably leave you here in this cell until I decide what to do.'" Blair took Terry's conversation with him to mean that Terry would assign him to "long-term indefinite segregation." Blair asserts that Terry had a "responsibility to take reasonable measures to ensure prevention[sic], at least try, of me being physically assaulted a second time[.]" At the Grievance Appeal stage, Blair does not name Terry or specifically reference his complaint against Terry. (*See id.* at 11.) In this form, Blair stated that he had a "right to be protected and to live safely in the general population as opposed to being confined to supermax security housing as a victim of an assault[,]" and that he "repeatedly asked to also be transferred to another facility, as an alternative, after [he] was assaulted the first time[.]"

Terry's first and second arguments are not persuasive for the same reasons as provided above in Parts II.1.a and II.1.d. First, as explained in Part II.1.a, Blair's failure to name Terry in the IRR and Grievance Appeal is not fatal to the exhaustion requirement because MDOC's grievance procedure did not require him to do so. *See Taylor*, 2015 U.S. Dist. LEXIS 26909, *3. Second, as explained in Parts II.1.a and II.1.d, Blair's grievance SCCC-15-1266 was denied, at every administrative level of review, on the merits and not for its failure to comply with MDOC's grievance procedure. *See Hammett*, 681 F.3d at 947 (PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits).

Relevant to Terry's third argument, proper exhaustion is defined by the prison grievance process, including "[t]he level of detail necessary in a grievance to comply with the grievance

procedures." *Jones*, 549 U.S. at 218. MDOC's grievance procedure requires only that "[t]he offender . . . state the subject of the complaint." (Doc. 97-5 at 10, ¶ K.1.b.) Terry has not pointed to any requirement that Blair's grievance must exactly match his later federal claim. Blair's grievance SCCC-15-1266 concerns "negligent security by [prison] staff." (Doc. 97-4 at 2.) In support, Blair made the following assertions about events leading up to the June 7 attack: that despite his requests for protective custody or transfer to another facility after the April attack, he was kept in administrative segregation as a form of punishment; and he understood Terry's statements to him—that Terry would "probably leave [Blair] here until [Terry] decided what to do"—to mean he would be kept in administrative segregation indefinitely. These assertions do not exactly match the allegations in Blair's Complaint regarding Terry. However, SCCC-15-1226 gave MDOC a fair opportunity to address the issues that later formed the basis for Blair's claims against Terry.

Because SCCC-16-1266 concerns the allegations that form the basis for Blair's claims against Terry and MDOC did not deny SCCC-15-1266 as procedurally deficient at any stage but instead addressed it on the merits, Blair exhausted his claims against Terry through SCCC-15-1266. Consequently, Terry has not established he is entitled to summary judgment of Blair's claims in Counts III or IV per the PLRA's exhaustion requirement.

### 2. Motion for Summary Judgment as to Counts I, II, and III

To succeed on his failure-to-protect claims, Blair must prove Eighth Amendment violations. *See Farmer v. Brennan*, 511 U.S. 825, 822 (1994). The Eighth Amendment requires prison officials to provide humane conditions of confinement, which includes "tak[ing] reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). In particular, "[p]rison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000); *Farmer*, 511 U.S. at 834 (Although "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society[,] . . . every injury suffered by one prisoner at the hands of another [does not] translate[] into constitutional liability for prison officials responsible for the victim's safety." (internal quotation marks and citation omitted)).

A prisoner must satisfy two elements to establish a constitutional violation—one objective component and one subjective component. A prisoner must establish first, that "he is

incarcerated under conditions posing a substantial risk of serious harm[,]" and second, that the defendant acted with "deliberate indifference" to that risk. *Farmer*, 511 U.S. at 834.

The Supreme Court in *Farmer v. Brennan* defined deliberate indifference as lying somewhere between negligence and the actual intent to cause harm; it requires proving a mental state equivalent to criminal recklessness. *Id.* at 835-37. To that end, the Supreme Court adopted the following two-part test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837 (An official will not be liable for a significant risk of harm that he or she did not perceive). In considering this test, deliberate indifference is viewed from the official's perspective at the time in question, not from a viewpoint of perfect hindsight, *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998), and in light of the official's difficult task in keeping dangerous individuals safe, *Farmer*, 511 U.S. at 844. Whether an official knew of the risk can be proven by inference from circumstantial evidence. *Farmer*, 511 U.S. at 842; *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998). "An official is deliberately indifferent [under the test's second element] if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007) (citing *Farmer*, 511 U.S. at 844-45).

Qualified immunity protects a government official from liability "when an official's conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quotation omitted). Defendants are entitled to qualified immunity unless the answers to both of the following questions is yes: (1) the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional right; and (2) that constitutional right was clearly established at the relevant time, such that a reasonable officer would have known that his or her actions were unlawful. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citations omitted). The doctrine of qualified immunity's protection extends to "all but the plainly incompetent or those who willingly violate the law." *Jackson*, 140 F.3d at 1151 (citation omitted).

SCCC Defendants argue they are entitled to summary judgment on Blair's failure-to-protect claims in Counts I (against Unit 5), II (against Bates), and III (against Terry) because Defendants had no actual knowledge of a substantial risk of serious harm to Blair.

SCCC Defendants contend the evidence does not show they were actually aware of a substantial risk before the June 7 attack, and further that knowledge of the first attack is a generalized risk of harm that does not equate to actual, specific knowledge of a substantial risk.[11] Thus, the issue is deliberate indifference. The Court analyzes the issue as to each SCCC Defendant individually. *S.M. v. Kingbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("[T]he doctrine of qualified immunity requires an individualized analysis of each officer's alleged conduct." (quotation omitted)).

### a.    Count II (Bates)

Bates was present at both the April 7 and June 7 attacks. During the June 7 attack, Blair was attacked from behind while he was outdoors in the main yard. Viewed in the light most favorable to Blair, at the time of the June attack, Bates was standing outside the dining room, roughly twenty feet away from Blair, smoking a cigarette, saw Blair collapsed on the ground, and waited several minutes before approaching Blair and calling for medical assistance.

To the extent Blair claims Bates failed to protect him from the June attack, there is no evidence that Bates knew of a substantial risk to Blair's safety. Bates has not presented evidence to show that from Bates' perspective, the risk to Blair of a second attack was obvious. *Farmer*, 511 U.S. at 842 ("a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious."). Blair contends knowledge of the specific risk of an attack on Blair can be imputed to Bates based on the facts that a month prior, Blair was attacked only hours after arriving at SCCC by an assailant who was unknown to Blair and who had to have Blair identified for him so he knew who to attack. However, while Bates did witness and intervene in the April attack, Blair presents no evidence Bates knew of these specific details surrounding the April attack. Regarding any knowledge of a general risk to Blair's safety, Blair presents no evidence from which that inference can be drawn, including that Bates knew Unit 5 Offenders had been released into the main yard. The evidence shows only that, from Bates' perspective, the June attack was a surprise attack. *See Prosser v. Ross*, 70 F.3d 1005, 1007 (8th Cir. 1995) ("[P]rison officials are entitled to qualified immunity from claims arising out of a surprise attack by one inmate on another.") (citations omitted).

As to Blair's claim Bates failed to intervene or timely respond following the June attack, Blair argues the discrepancy between Bates', Mr. Willet's, and Blair's recollection of what

---

[11] Blair admits in his suggestions in opposition he does not claim Defendants failed to protect him from the first attack.

transpired, raises questions about whether Bates delayed in summoning help. Specifically, Bates recalls that she was conducting pat searches outside food service when she heard grunts behind her, noticed Blair on the ground, approached him and asked if he was okay, noticed blood, and called medical assistance. Mr. Willet's recollection somewhat differs. He saw Blair through the window as he was leaving the dining room, passed by Bates and approached Blair, and then got Bates' attention who was smoking a cigarette. Blair recalls that he was lying on the ground for several minutes calling for help before he was assisted. Despite minor discrepancies in these reports, there is insufficient evidence to support Bates acted with deliberate indifference. Although Mr. Willet testifies he would have seen Blair if he were standing where Bates was, this is speculative and alone insufficient to support Bates witnessed the June attack yet failed to intervene. At most, Bates was negligent for any delayed response following the June attack, and negligence is not the standard to establish a constitutional violation. Further, the facts here do not present the situation where deliberate indifference is shown by "the obvious inadequacy of a response to a risk [which] may support an inference that the officer recognized the inappropriateness of his [or her] conduct." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (citation omitted).

Therefore, the evidence in the summary judgment record is insufficient to demonstrate deliberate indifference by Bates. Consequently, because Blair presented insufficient evidence that Bates knew of a substantial risk of attack on Blair at the time of the June attack, Bates is entitled to qualified immunity.

### b.     Count III (Terry)

Following the April attack while Blair was in administrative segregation, Blair told Terry he had a "hit" on him and he needed to be placed in protective custody or to be transferred to another institution. When Terry responded that neither protective custody nor transfer were options, Blair construed the response as a threat that he would remain in administrative segregation indefinitely. As a result, Blair signed protective waivers and Terry released him into the general population where he was attacked two days later. There is no evidence in the record that Terry took any steps to investigate the "hit" or took any steps to ensure Blair's protection before releasing him into general population.

While Terry's general awareness of the April attack is not disputed, Blair asserts that knowledge of certain information gathered in the MDOC investigation of the April 7 attack can

be imputed to Terry, and in particular, that it was clear Mahasin carried out the April attack at the behest of unknown person(s) still likely at large in general population. However, outside of Terry's position as Deputy Assistant Warden, Blair presents no evidence Terry was aware of any of the findings in MDOC's investigation report of the April attack, a report that was dated two days after the second attack occurred.

Even without specific knowledge of these specific details surrounding the April attack, based on the facts viewed in the light most favorable to Blair, a reasonable juror could conclude Terry acted with deliberate indifference to a substantial risk of harm because he did not take reasonable steps to respond to a known risk after Blair informed Terry he had a "hit" on him and he needed protective custody or to be transferred to another institution when Blair had been attacked a month before. At the time of the alleged violation, a reasonable officer in Terry's position would have understood that his conduct violated Blair's clearly established right to be free from violence by other inmates. The fact that Blair signed protective waivers does not foreclose the possibility that Terry was deliberately indifferent to the fact that releasing Blair into general population created a substantial risk of harm to Blair. Consequently, based on the summary judgment record, Terry is not entitled to qualified immunity on Blair's failure-to-protect claim.

### c.     Count I (Unit 5 officers)

Unit 5 officers assigned to Unit 5 at the time of the attack released the Unit 5 offenders, who attacked Blair, into the yard despite the MDOC policy that inmates assigned to different housing units are not permitted to recreate together on the yard. As for each officer's specific responsibility at the time, Rippinger was the sergeant responsible for overseeing inmate "call outs" and movement; Tausend was responsible for opening the cell doors in Unit 5; and Olalde was monitoring inmates at the Unit 5 doors. Unit 5 officers present no evidence demonstrating Unit 5 Offenders had "call outs" or other justification for being released. Olalde had a "gut feeling" after observing abnormal behavior and twice reported his suspicion to the Captain's office on the day of the June attack. In addition, Holland observed that Unit 5 had been unusually quiet for two days prior to the June attack.

The Court is not persuaded by Blair's arguments that there is a triable issue as to whether any of the Unit 5 Officer's conduct amounted to deliberate indifference. Blair points out that not only is there no evidence the Unit 5 Offenders had "call outs," but the video footage tracking the

Unit 5 offenders' movements shows behavior inconsistent with that group being released for a "call out" to a specific location. Blair contends that releasing Unit 5 offenders into the main yard with Blair and other Unit 6 inmates created a substantial risk of serious harm to Blair and resulted in the second attack. Based on the summary judgment record, however, the Court finds the facts viewed in the light most favorable to Blair show Unit 5 officers acted, at most, with gross negligence toward the risk of harm to Blair.

First, failure to adhere to the MDOC policy against comingling alone is insufficient evidence to give rise to knowledge of a substantial risk of attack in light of the evidence that comingling is permitted in situations where an inmate does have a "call out." Although the policy was designed to protect inmates, it did not give rise to an unconstitutional condition at SCCC. Also, Blair presents no evidence in the record to support that any of the Unit 5 officers were aware of details surrounding the April attack to suggest knowledge of the risk of another attack on Blair. Finally, as for Holland and Olalde's suspicions, in Olalde's case, he twice reported suspicious activity to the Captain's office, which was reasonable conduct; and in Holland's case, he was at most, grossly negligent, by observing abnormal behavior yet failing to take any action.

Under these circumstances, the evidence in the summary judgment record is insufficient to demonstrate deliberate indifference by Unit 5 officers. Consequently, the Court concludes the Unit 5 officers—Rippinger, Roach, Tausend, Holland, and Olalde—are entitled to qualified immunity.

### 3.    Motion for Summary Judgment as to Count VI (Gerke)

To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (citation omitted). In short, "the plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." *Id.* (citation omitted). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the 'question is so free from doubt as to justify taking it from the jury.'" *Id.* (citations omitted).

Gerke agues Blair cannot establish a retaliatory discipline claim against him because he did not engage in retaliatory discipline against Blair. Gerke contends he never directly issued Blair a conduct violation. Gerke also argues Blair has not suffered an injury that would chill a person of ordinary firmness from continuing to file grievances and lawsuits.

The Court does not find Gerke's arguments persuasive. First, it is not disputed that Blair engaged in a protected activity by submitting prison grievances and filing a lawsuit. *See Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) ("A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this court.") (citation omitted). The issuance of the conduct violation is actionable if done in retaliation for Blair having filed a grievance or a lawsuit. *See Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 1009) ("the filing of a disciplinary charge . . . is actionable under section 1983 if done in retaliation for [the inmate's] having filed a grievance pursuant to established procedures.") (citation omitted). Moreover, even if there was a legitimate reason for the issuance of the conduct violation, the conduct can still be retaliatory if motivated even in part by a protected activity. *See Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001).

Based on the facts viewed in the light most favorable to Blair, the Court finds there are genuine issues of material fact as to whether Gerke caused the conduct violation to be issued, and if so, whether Gerke's motivation for that adverse action was Blair's filing prison grievances and/or a lawsuit. Gerke, as functional unit manager, was in charge of the housing unit, and supervised the officer who issued the conduct violation.[12] While Blair admits Gerke never directly issued him a conduct violation, he asserts "everything that goes on in [Unit 6] for something like that comes from Gerke." As a result of the conduct violation, Blair was sanctioned with administrative segregation from October 27, 2016, until January 5, 2017. On multiple occasions, Gerke expressed he did not want Blair in protective custody, and he did in fact recommend that Blair be placed in administrative segregation. Gerke's statement to another inmate when Blair was returning to protective custody that—"he will bury him in [administrative segregation], and Blair can file a lawsuit about that with his lawyers since he likes to sue

___

[12] At oral argument, pertaining to Blair's claim against Gerke, Defendants argue Gerke cannot be held liable under § 1983 on a theory of respondeat superior. While this is true, Gerke can "incur liability . . . for [his] personal involvement in a constitutional violation, or when [his] corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir. 2012) (citation and internal quotation marks omitted).

people[]"—implies Gerke's ability to place Blair in administrative segregation as well as scorn toward Blair's lawsuit.

Consequently, because Blair established genuine issues of material fact whether Gerke caused the conduct violation to be issued, and if so, whether Gerke's motivation for that adverse action was at least in part Blair's filing prison grievances and/or a lawsuit, Gerke is not entitled to summary judgment on Count VI.

**IV.     Issue of Sealing Exhibits A, B, C, F, H, K, L, M, 1, and 2**

In connection with the summary judgment motion, the parties sought leave to file ten exhibits under seal. The Court directed for more information to meet the heightened requirement for sealing documents in the record, especially in light of the documents being submitted in connection with the summary judgment motion. For the reasons stated in the Defendants' supplemental briefs (docs. 136 and 142), the Court finds sufficient grounds to seal Exhibits: A, B, F, H, K, L, M, 1, and 2. Pursuant to Defendants' withdrawal of its request as to Exhibit C, and upon no objection by Blair at the November 17 hearing, Exhibit C will be unsealed.

**V.    Conclusion**

Accordingly, the following is **ORDERED**:

1.    <u>FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES</u>

On the ground of failure to exhaust administrative remedies, the Court rules Defendants' Motions to Dismiss and Motion for Partial Summary Judgment as follows:

    a.  Count I against Rodney Holland, Nicholas Olalde, Phillip Rippinger, Jeremy Roach, and Victoria Tausend for failure to protect from attack - **DENIED**. (Docs. 96, 123 at 21-22.)

    b.  Count II against Sabrina Bates for failure to protect from attack - **DENIED**. (Docs. 93, 123 at 24-26.)

    c.  Count III against Roger Terry for failure to protect from attack - **DENIED**. (Docs. 97, 123 at 21-22.)

    d.  Count IV against Roger Terry for denial of due process - **DENIED**. (Docs. 97, 123 at 21-22.)

    e.  Count V against Richard Martin for retaliatory discipline - **GRANTED**. Count V against Martin is **DISMISSED without prejudice** for failure to exhaust administrative remedies.  (Docs. 95, 123 at 23-24.)

    f.  Count VI against John Gerke for retaliatory discipline - **DENIED**. (Docs. 94, 123 at 19-21)

2.    <u>REMAINING SUMMARY JUDGMENT ARGUMENTS</u>

On the remaining grounds, including qualified immunity, the Court rules Defendants' Motion for Summary Judgment as follows:

    a.  Count I against Rodney Holland, Nicholas Olalde, Phillip Rippinger, Jeremy Roach, and Victoria Tausend for failure to protect from attack - **GRANTED** on grounds of qualified immunity.  (Doc. 123 at 26-32.)

    b.  Count II against Sabrina Bates for failure to protect from attack - **GRANTED** on grounds of qualified immunity.  (Doc. 123 at 26-32.)

    c.  Count III against Roger Terry for failure to protect from attack - **DENIED**. (Doc. 123 at 26-32.)

    d.  Count IV against Roger Terry for denial of due process was not challenged.

    e.  Count V against Richard Martin for retaliatory discipline arguments are not addressed as this count is dismissed for failure to exhaust administrative remedies. (Doc. 123 at 32-34.)

    f.  Count VI against John Gerke for retaliatory discipline - **DENIED**. (Doc. 123 at 32-34.)

4.   FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6):

    a.   John Gerke's Motion to Dismiss is **DENIED**.  (Doc. 94.)

5.   SEAL ISSUE

The request to permanently seal certain documents submitted in connection with the summary judgment motion is ruled as follows:

    a.   Exhibits A, B, F, H, K, L, M, 1, and 2 - **GRANTED**.  (Docs. 124, 141.)

    b.   Exhibit C - **DENIED as moot**.

    c.   The Clerk of the Court is directed to unseal Exhibit C (doc. 124-3, -4, and -5).

6.   CLAIMS REMAINING FOR TRIAL

The following claims remain for trial:

    a.   Count III against Roger Terry for failure to protect from attack;

    b.   Count IV against Roger Terry for denial of due process; and

    c.   Count VI against John Gerke for retaliatory discipline.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  December 8, 2017